# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

### Ft. Worth Division

| | | |
|---|---|---|
| ERGUN CANER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 4:13-cv-00494 (Y) |
| | * | |
| JASON SMATHERS, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT'S REPLY IN SUPPORT OF HIS PETITION FOR ATTORNEYS' FEES

Kelly B. McClanahan, Esq.
N.D. Tex. Bar #984704DC
National Security Counselors
1200 South Courthouse Road
Suite 124
Arlington, VA  22204
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Defendant*

Date:   July 20, 2014

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

ARGUMENT ................................................................................................................1

I.    THIS CASE WAS FRIVOLOUS, OBJECTIVELY UNREASONABLE, AND
IMPROPERLY MOTIVATED, AND AWARDING FEES WILL DETER
CANER AND OTHERS FROM FILING SIMILAR ACTIONS.............................1

    A.    This Case Was Frivolous .............................................................2

    B.    This Case Was Objectively Unreasonable ....................................................10

    C.    This Case Was Improperly Motivated ...........................................................12

    D.    Attorneys' Fees Are Needed to Deter Future Litigation................................14

II.    THE FEE REQUEST IS REASONABLE................................................................16

III.    SECTION 1927 PENALTIES ARE APPROPRIATE ............................................19

CONCLUSION..............................................................................................................21

# TABLE OF AUTHORITIES

**Cases:**                                                                           **Pages**

*Blum v. Stenson*, 465 U.S. 886 (1984) ..................................................................18

*Boswell v. Dep't of Treasury, Office of Comptroller of Currency*, 979 F. Supp. 458 (N.D. Tex. 1997)..................................................................11

*Caner v. Autry*, No. 14-4, 2014 U.S. Dist. LEXIS 66508 (W.D. Va. May 14, 2014)..............2, 4, 8, 11, 12

*Caner v. Autry*, No. 14-4, 2014 U.S. Dist. LEXIS 90179 (W.D. Va. July 1, 2014)................15, 16, 18

*Carson v. Billings Police Dep't*, 470 F.3d 889 (9th Cir. 2006)................................17

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ...................................................1, 2

*Mattel, Inc. v. Walking Mt. Prods.*, No. 99-8543, 2004 U.S. Dist. LEXIS 12469 (C.D. Cal. June 24, 2004) ..................................................................9

*McGaughey v. Twentieth Century Fox Film Corp.*, 12 F.3d 62 (5th Cir. 1994)....................1

*Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482 (10th Cir. 1994)..............17

*Micromanipulator Co. v. Bough*, 779 F.2d 255, 259 (5th Cir. 1985) .....................................1

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 381 (5th Cir. 2004)...1

*Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010) ........................................1

*SOFA Entm't v. Dodger Prods.*, 709 F.3d 1273, 1280 (9th Cir. 2013) ....................................10, 15

*Stern v. Does*, No. 09-1986, 2011 U.S. Dist. LEXIS 37735 (C.D. Cal. Feb. 10, 2011)........9, 14

*Triangle Pub., Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171 (5th Cir. 1980)..........10

*United Steelworkers v. Retirement Income Plan for Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555 (9th Cir. 2008) ..................................................................17

*Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir.) ...................................1, 2, 14

*Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942 (9th Cir. 2007)........................................17

**Statutes:**

17 U.S.C. § 101 ..................................................................................................6, 7

17 U.S.C. § 505 .....................................................................................................1

**Other Authorities:**

Tom Breen, *Christian leader faces questions about Muslim past*, USA Today, May 21,
        2010 ...........................................................................................................13

Tom Breen, *Muslim-turned-preacher faces university inquiry*, Huffington Post, June 6,
        2010 ...........................................................................................................13

http://www.thecanerproject.com/ ............................................................................14

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) ...........................................10

10-54 Moore's Federal Practice - Civil § 54.190(2)(b)(i)(B) .................................17

"Rolling out the Public Relations Machine" (July 31, 2010) .................................14

Daniel Spratlin, "Detached from reality: Reputation repair for hire" (Aug. 3, 2010) ...........14

## ARGUMENT

After substantially prevailing in this meritless copyright infringement action, Defendant Jason Smathers ("Smathers") petitioned the Court to award attorneys' fees for this suit according to the "updated" *Laffey* Matrix in the amount of $21,746.70 and to impose an additional $5,000.00 in fees because of the frivolous nature of this suit and the manner in which Plaintiff Ergun Caner's ("Caner") attorney unreasonably and vexatiously multiplied the proceedings by consistently indicating opposition to motions and then conceding them at the last minute (or simply failing to respond at all) instead of filing opposition briefs. In response, Caner argues that the fact that this Court relied on the "fair use" doctrine when deciding this case precludes it from assessing attorneys' fees against Caner, that the amount of fees requested is unreasonable, and that his counsel's consistent delays and reversals do not constitute dilatory behavior. None of these arguments bears up to close scrutiny.

I. **THIS CASE WAS FRIVOLOUS, OBJECTIVELY UNREASONABLE, AND IMPROPERLY MOTIVATED, AND AWARDING FEES WILL DETER CANER AND OTHERS FROM FILING SIMILAR ACTIONS**

The Copyright Act authorizes a district court to "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Although the recovery of attorneys' fees is not automatic, *see Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994), an award of fees to the prevailing party in a copyright action is "the rule rather than the exception and should be awarded routinely." *McGaughey v. Twentieth Century Fox Film Corp.*, 12 F.3d 62, 65 (5th Cir. 1994) (quoting *Micromanipulator Co. v. Bough*, 779 F.2d 255, 259 (5th Cir. 1985)); *see also Virgin Records Am., Inc. v. Thompson*, 512 U.S. 724, 726 (5th Cir.), *cert. denied*, 553 U.S. 1019 (2008); *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 381 (5th Cir. 2004), *abrog. on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010). Such fees should be

1

awarded evenhandedly to both prevailing plaintiffs and defendants. *Fogerty*, 510 U.S. at 534.

Among the factors the Court should consider in deciding whether to award attorneys' fees to a

prevailing defendant in a copyright action are "frivolousness, motivation, objective

unreasonableness . . . and the need in particular circumstances to advance considerations of

compensation and deterrence." *Virgin Records*, 512 F.3d at 726 (quoting *Fogerty*, 510 U.S. at 534

n.19).

### A.     This Case Was Frivolous.

When considering the merits of this case, it is important not only to note this Court's opinion

on the matter, but also the subsequent opinion of the U.S. District Court for the Western District of

Virginia, to which Caner's case against Jonathan Autry ("Autry") was transferred for improper

venue.  The record before that court was significantly more fleshed out than in this case, due in large

part to the fact that it held oral arguments regarding the motions to dismiss.  Moreover, Judge Moon

delved far deeper into Caner's motivation for bringing this case than this Court did, and in doing so

found Caner's case wanting at every step.  *See Caner v. Autry*, No. 14-4, 2014 U.S. Dist. LEXIS

66508, *passim* (W.D. Va. May 14, 2014) [hereinafter *Autry I*].[1]

Before exploring Judge Moon's thorough analysis of Caner's case, it is first important to

address Caner's specific objections to Smathers' Petition.  Caner first argues that he did not

frivolously bring this case because he filed his applications for copyright protection ninety-eight

minutes before filing his Amended Complaint.  (*See* Pl.'s Resp. Dkt. #54—Jason Smathers' Mot.

Att'y Fees, Dkt. #59, at 5-6 (filed May 22, 2014) [hereinafter Pl.'s Resp.].)  Caner argues:

---

[1] While the normal naming convention would require referring to this case as *Caner* in short form, doing so would unnecessarily confuse matters.  For that reason, Judge Moon's case will be referred to herein as *Autry*.

> Under Federal Rule of Civil Procedure 4(m)—Time Limit for Service—a defendant must be served within 120 days of the filing of the Complaint. Under the [Digital Millennium Copyright Act ("DMCA")], a plaintiff seeking to protect their perceived copyright interests is required to file suit within a ten to fourteen day window or the work will be reposted to the Internet on the service provider's website. Because of the short time limit to file—and the concomitant 120 day window provided by Rule 4—Dr. Caner filed the suit, explored his legal options during the 120 day time limit, filed his copyright applications, amended his Complaint (Dkt. #13) to reflect the registration with the Copyright Office, and then served Mr. Smathers. Furthermore, there is no legal requirement for how long a work is to be registered with the Copyright office before a complaint can be filed and served—the Copyright Act merely requires that the work be registered.

(*Id.*) In other words, Caner admits that at the time he brought this lawsuit, he *did not have grounds to do so*, and he had not yet even "explored his legal options" when he first imposed the burden of processing this case on the Court. He admits to using this Court to grant himself a *de facto* 120-day extension of the DMCA's "ten to fourteen day window" with *no* expectation that his initial Complaint would survive judicial review if he did not later register his alleged copyrights and file an Amended Complaint. He justifies this blatantly dilatory behavior by complaining that the DMCA "required" him to file suit within two weeks, blind—whether by accident or design—to the fact that the drafters of the DMCA clearly envisioned that a complainant would use that time to put together a *proper* Complaint and not just a placeholder filing to forestall republication while he "explored his legal options." Knowingly and deliberately filing a Complaint which will not survive a motion to dismiss and then running out the clock on service (Smathers was served on Day 119) before "amending" the Complaint to correct the known deficiencies is the very epitome of a "frivolous" filing.[2] The 120-day service window was designed to allow a plaintiff sufficient time to effect service of a proper complaint, not to allow a plaintiff to unilaterally grant himself an extension of a

---

[2] Additionally, since Caner never actually served the original Complaint on Defendant (he only served the Amended Complaint), it can be argued that filing a Complaint with no intention of actually serving it on any Defendant fits easily within the definition of "frivolousness."

3

statutory deadline by filing a knowingly insufficient document.[3]  In light of this clearly abusive and

dilatory behavior, it is no surprise that Judge Moon observed that "Plaintiff's unusual conduct gives

rise to the impression that he seeks to reveal as little as possible to conceal for as long as possible

that his claims lack merit."  *Autry I*, 2014 U.S. Dist. LEXIS at *34.[4]

      Caner then argues that Smathers has not demonstrated that the DMCA takedown notices

were fraudulent, but this claim cannot be reconciled with the record in this case.  Caner's takedown

notices read, in pertinent part:

> 1) Dr. Caner is the exclusive owner of the copyrights in and to the text, artwork, logos, videos, and photographs of his public speeches and presentations. . . .
> 3) Any unauthorized use of this material infringes upon the exclusive right of the owner, Dr. Caner.
>
> Please be advised that at no time has Dr. Caner either received a request for permission or granted permission to anyone to post any portion of his copyrighted materials.  . . . I have a good faith belief that these uses of Dr. Caner's material have never been authorized by the copyright owner, its agent, or the law.  The information in this notification is accurate, and under penalty of perjury, I am the owner, or an agent authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.

---

[3] The logical extension of this argument would be a clever would-be plaintiff filing a lawsuit before he had actually incurred any harm in hopes that he would have standing to sue within 120 days.  One need only imagine a person who filed a lawsuit against a federal agency under the Freedom of Information Act ("FOIA") before he even submitted a FOIA request to the agency.  According to Caner, that lawsuit would not be frivolous as long as the plaintiff later filed his FOIA request and allowed enough time (twenty business days) for the agency's statutory response deadline to pass before "amending" and serving his complaint within the 120-day service window.

[4] Additionally, even assuming *arguendo* that the Copyright Act only technically requires registration *before filing*, one cannot help but question whether electronically submitting a registration application to the Copyright Office at 10:15 PM before filing an Amended Complaint with the Court less than two hours later is the behavior of a plaintiff acting out of a good faith belief that his Complaint is meritorious.

(DMCA Takedown Notice of 6/3/13, attached as Ex. D.)  This statement includes two explicit misrepresentations: 1) Caner is the exclusive owner of the relevant copyrights; and 2) Caner has never granted permission to anyone to reproduce any portion of these presentations.

Caner attempts to hide behind the fact that the Court dismissed his case on "fair use" grounds to avoid the question of whether or not he held an exclusive copyright in the first place, but the Court will likely need nonetheless to consider this question in order to determine if his case was frivolous.  Since all of the arguments on this point have already been made in previous briefs, it is not necessary to repeat them here.  Suffice it to say, unless Caner's counsel did *no* research into government contract law or FOIA before writing these takedown notices, it would be impossible for him to truthfully "have a good faith belief that these uses of Dr. Caner's material have never been authorized by the copyright owner, its agent, or the law."

However, the Court may find that these takedown notices were fraudulent without even exploring the question of copyright ownership.  The statement, "Please be advised that at no time has Dr. Caner either received a request for permission or granted permission to anyone to post any portion of his copyrighted materials," is controverted by his counsel's own arguments in this case. In an attempt to avoid dismissal for failure to join an indispensable party, Caner's counsel argued, "According to Dr. Caner, even though he was nominally compensated for delivering the speeches to the U.S. Marines as an independent contractor, *he is doubtful* that there was even a written agreement that was signed. *To the best of his recollection*, Dr. did not sign an agreement. . . . Here, *to the best of Dr. Caner's recollection*, no such agreement was in existence."  (Pl.'s Mem. Resp. to Dkt. #29—Def. Jason Smathers' Mot. Dismiss for Failure to Join All Necessary Parties & Mot. for More Definite Statement, Dkt. #39, at 2 (filed Jan. 6, 2014) (emphasis added).)  In other words, in

January 2014 Caner[5] *did not recall* if he signed a contract "grant[ing] permission to anyone to post any portion of his copyrighted materials," but in June 2013 his counsel unequivocally stated under penalty of perjury that he *had not done so*. Both of these statements cannot be true. If Caner's counsel *knew* in June 2013 that he had not signed such a contract, then he materially misled the Court in January 2014 by arguing simply that his client did not remember signing one. If Caner truly did not remember in January 2014 whether or not he signed such a contract, then his counsel fraudulently stated under penalty of perjury that he had not done so when filing the takedown notices.[6]

The above cited reasons are the same reasons that Caner's statement that his works were not "made for hire" constituted material misrepresentations in the copyright applications. Caner admits that "a 'work made for hire' deals with the intellectual property rights of . . . independent contractors and their hiring parties when their work was being used according to a list of specially delineated work classes where an agreement is signed assigning the rights." (Pl.'s Resp. at 7 (citing 17 U.S.C. § 101).) Caner further admits that one of the "work made for hire" categories is "a work specially ordered or commissioned for use as . . . a part of a[n] . . . audiovisual work . . . , if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." (Pl.'s Resp. at 7 n.2 (quoting 17 U.S.C. § 101).) Therefore, the record shows that these were clearly works made for hire. First, it is undisputed that they were specially ordered

---

[5] While it is true that Caner never actually authored a sworn declaration stating this, the Court should not allow him to escape impeachment by simply refusing to speak on penalty of perjury.

[6] The fact that Caner's counsel and not Caner himself signed these takedown notices does admittedly raise the question of whether it was Caner or his counsel who committed perjury. However, Smathers maintains that this distinction is irrelevant to the immediate inquiry, and if Caner desires to later recover his losses from his attorney, that is beyond the scope of this case.

or commissioned by the U.S. Marine Corps.  Second, it is undisputed that the U.S. Marine Corps

intended to make them part of an audiovisual work, and that Caner knew this, as evidenced by the

fact that the videos were clearly recorded by a preset camera mounted on a tripod manned by a

cameraman and fully visible to Caner during the presentations.  *See*

https://www.youtube.com/watch?v=Oey8lIkPvjM (last accessed June 7, 2014);

https://www.youtube.com/watch?v=UFzbQKr_-LA (last accessed June 7, 2014).[7]

Lastly, it is effectively undisputed that Caner and a representative of the U.S. Marine Corps

"expressly agree[d] in a written instrument signed by them that the work shall be considered a work

made for hire."  17 U.S.C. § 101.  Smathers clearly demonstrated that government regulations

required that such language be included in any contracts for this type of work and that the

presumption of agency regularity requires the Court to presume that the agency followed its

regulations (*see* Def. Jason Smathers' Mem. Supp. Mot. Dismiss for Failure to Join All Necessary

Parties & Mot. for More Definite Statement, Dkt. #29, at 3-6 (filed Nov. 26, 2013)), and Caner did

not offer any arguments to refute this other than an unsworn assertion made by his counsel that he

did not recall signing such a contract.  Therefore, these lectures were clearly works made for hire,

and Caner materially misrepresented that fact in his copyright applications.[8]

---

[7] At the 6:15 mark in the second video, Caner even looks directly at the camera and states, "Please don't release this to Dr. Falwell," indicating that he was fully aware of the recording.

[8] Should the Court be concerned that a finding that these were works made for hire should not automatically mean that Caner fraudulently misrepresented that fact on his copyright applications, Smathers draws the Court's attention to Caner's brief, in which his counsel—the same lawyer who submitted the copyright applications—purports to possess a thorough-enough understanding of this "legal term of art" to explain it to Smathers, who "simply does not understand the concept of 'work made for hire' under the Copyright Act."  (Pl.'s Resp. at 6-7.)  The Court should presume that an attorney of Mr. Gibbs' stature would have properly researched the meaning of this phrase before he represented to the Copyright Office that these were not works made for hire.

Additionally, the Court can consider this case to be frivolous based on his counsel's conduct in the *Autry* oral arguments, not to mention Caner's thoroughly lacking arguments in his briefs in the instant case. Before Judge Moon, Caner's counsel repeatedly made off-the-wall statements on the law and refused to cite legal authority to support his musings, prompting Judge Moon to observe:

> Plaintiff's counsel made astounding claims during the hearing that discovery would affect the fair use analysis by showing that Defendant was not "qualified" to direct "appropriate criticism" at Plaintiff, unlike "people that are qualified to render those opinions i[n] the market place and exchange of ideas in academia and elsewhere," and therefore Defendant could not assert the fair use defense.

*Autry I*, 2014 U.S. Dist. LEXIS at *37-38 (citations omitted). Judge Moon further opined:

> Plaintiff's spurious assertion that fair use only applies where a speaker "qualified to render . . . opinions" or to level "appropriate criticism" at a public figure proves ludicrous on its face. The First Amendment's protections, advanced by the fair use defense, have never applied to some bizarre oligarchy of "qualified" speakers. Excluding speakers who criticize public figures from protection due to the speaker's social status, level of education, or other nebulous "qualifying" factors would nullify the broad protections the First Amendment is meant to provide, and stifle the open discourse that stands against tyranny, intolerance, and oppression.

*Id.* at *39 (citations omitted).

Unsurprisingly, Caner's counsel cited—and likely could cite—no authority for these arguments other than his own beliefs, a failing which did not go unremarked upon by the court:

> When pressed at the hearing to provide authority for this counterintuitive proposition, Plaintiff's counsel fell back on his "belie[fs]" and failed to do so. As Defendant's counsel aptly observed during the hearing, if Plaintiff's counsel intends to make such outlandish arguments, he should go to the trouble of "typ[ing] out the citations" for any supporting authority. I doubt such authority exists.

*Id.* at *40. In fact, during the 45-minute oral arguments, Judge Moon gave Caner's counsel every opportunity to come up with a non-frivolous reason to sustain the case, and he could not do so. The court ultimately held, "Even considering the evidence Plaintiff seeks in discovery, there is

simply no indication Defendant engaged in the type of appropriation the Copyright Act seeks to prevent." *Id.* at *65.

Lastly, as noted above, Caner has not in the entire course of this litigation pointed this Court—or Judge Moon, for that matter—to a single case on fair use that would justify his position. He did not even *address* Smathers' arguments on fair use in the briefing in the instant case, and were it not for the oral arguments in *Autry*, we likely *never* would have learned why he considered either Defendant's use of the videos to constitute infringement. With the exception of a few factual specifics, the District Court for the Central District of California could have been describing this case when it opined:

> Plaintiff's copyright claims were objectively unreasonable. Plaintiff is a sophisticated entity with access to good legal representation. Plaintiff's claims were not in an unsettled area of law and had little likelihood of success. Plaintiff's copyright claims, therefore, were frivolous.
>
> Plaintiff's conduct also does not appear to be motivated by the protection of a valid interest. Plaintiff had access to sophisticated counsel who could have determined that such a suit was objectively unreasonable and frivolous. Instead, it appears Plaintiff forced Defendant into costly litigation to discourage him from using Barbie's image in his artwork.
>
> As to the factors of compensation and deterrence, Mattel (a large corporation) brought objectively unreasonable copyright claims against an individual artist. This is just the sort of situation in which this Court should award attorneys fees to deter this type of litigation which contravenes the intent of the Copyright Act.

*Mattel, Inc. v. Walking Mt. Prods.*, No. 99-8543, 2004 U.S. Dist. LEXIS 12469, at *7 (C.D. Cal. June 24, 2004).[9] Caner is well-educated and represented by competent counsel. This is not an unsettled area of the law, and the obvious fair use defense and unavailability of damages virtually guaranteed that he would not prevail. *See Stern v. Does*, No. 09-1986, 2011 U.S. Dist. LEXIS

---

[9] Because there is significant overlap between a case being "frivolous" and it being "objectively unreasonable," many opinions treat the two factors together. This brief will endeavor to treat them separately, but some overlap is unavoidable.

37735, at *40-49 & n.13 (C.D. Cal. Feb. 10, 2011), *aff'd*, 512 Fed. App'x 701, 703 (9th Cir. Cal. 2013) (fee award is proper where plaintiff's copyright claim was objectively reasonable on its face, but the defendant had an "obvious" fair use defense, the plaintiff could not seek statutory damages or attorney fees, plaintiff did not prove any damages, and plaintiff could not demonstrate need for an injunction).

 For the foregoing reasons, the Court should find that this case was frivolous and award attorneys' fees accordingly.

  **B.** **This Case Was Objectively Unreasonable.**

 After valiantly arguing against a holding that this case was frivolous, Caner moves on to the related question of whether or not it was objectively reasonable, arguing unconvincingly that it *was* reasonable because the Court relied on the fair use doctrine to deny him the relief he sought. (*See* Pl.'s Resp. at 8-9.) In Caner's opinion, because "the question of fair use has been appropriately described as 'the most troublesome in the whole law of copyright'" (*id.* (quoting *Triangle Pub., Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1174 (5th Cir. 1980)), requiring that each case "must be decided on its own facts" (*id.* (quoting H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 65 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678)), the Court should "refuse to award fees on a case where 1) Dr. Caner's entire works were used and 2) where the Court decided the case on the complex—and exclusively judicial—determination of fair use." (*See id.* at 9.)

 In other words, Caner argues that, because fair use can be a complicated issue, any case in which this doctrine plays a role is objectively reasonable. This bizarre reading of *Triangle Publications* cannot be squared with the volume of cases in which a defendant successfully argued fair use and received attorneys' fees after prevailing in the case. *See, e.g.*, *SOFA Entm't v. Dodger Prods.*, 709 F.3d 1273, 1280 (9th Cir. 2013) ("When a fee award encourages a defendant to litigate

10

a meritorious fair use claim against an unreasonable claim of infringement, the policies of the Copyright Act are served.").

Moreover, while this Court's holding in the instant case was fairly narrow, it should take notice of the fact that Judge Moon explored the factual and legal background of the case to a significantly greater degree, and it should carefully review Judge Moon's opinion when deciding the question of whether or not this was an objectively reasonable case. In particular, it is especially noteworthy that Judge Moon saw fit to point out the degree to which Caner himself has "extolled the virtues of the[ ] [First Amendment's] protections and warned against the dangers of censorship and 'misinformation'" while simultaneously arguing that only a select "qualified" few should be allowed to criticize *him*. *See Autry I*, 2014 U.S. Dist. LEXIS at *39-40. That statement perfectly encapsulates the unreasonableness of Caner's position and his true motivation for bringing this case.

However, neither of the above stated points says as much about the objective reasonableness of this case as the simple fact that Caner did not even *attempt* to refute Smathers' claim of fair use. As the Court noted, "Dr. Caner has apparently conceded this issue since he has offered no argument in his response with respect to Smathers's assertion of fair use." (Op., Dkt. #51, at 7 (filed Apr. 17, 2014) (citing *Boswell v. Dep't of Treasury, Office of Comptroller of Currency*, 979 F. Supp. 458, 465 (N.D. Tex. 1997)).) Frankly, it is difficult to imagine a case *less* objectively reasonable than one in which the plaintiff *conceded* the defendant's key defense the first time it was raised, especially when that defense was: a) obvious and b) based on information that the plaintiff knew well before even initiating the litigation. Caner asserts that he "had his 'day in court'" before losing on "a complex issue of law" (Pl.'s Resp. at 8), but his "day in court" consisted solely of admitting that the person he sued had the right to publish the information over which he was being sued. That

11

is not the behavior of a plaintiff acting out of a good faith belief that he has a viable copyright infringement case.

For the foregoing reasons, the Court should find that this case was objectively unreasonable and award attorneys' fees accordingly.

## C.     This Case Was Improperly Motivated.

Smathers has spilled much ink explaining Caner's actual motivations for bringing this case, and rehashing the matter here is not in the interest of judicial economy.  Judge Moon effectively summarized the conclusion thusly: "[A]ll the evidence proposed and submitted by both parties suggests Plaintiff has filed this suit to suppress legitimate criticism of alleged contradictions in the narrative that supported his rise to prominence."  *Autry*, 2014 U.S. Dist. LEXIS at *65.  If Smathers could identify one key fact which unquestionably compels this conclusion, it would be the undisputed fact that even after Defendant Jonathan Autry agreed to take down all of the videos Caner opposed and not to post any further videos of Caner, Caner refused to dismiss the claims against Autry unless he, his wife, *and his minor children* all signed non-disparagement agreements promising *never to criticize Caner*.  (*See* Jonathan Autry Decl., Dkt. #28-2, ¶¶ 32-35 (filed Nov. 26, 2013).)[10]

---

[10] Autry's counsel and brother Joshua Autry recently provided further detail regarding this point in a sworn declaration made in support of his fee petition, stating, "Not until after transfer of the case to [Virginia] did Dr. Caner's counsel drop his settlement demands that (1) Jonathan Autry turn over correspondence and names of other critics, and (2) Jonathan Autry's wife and three minor children sign non-disparagement [agreements].  Even then, Dr. Caner's counsel expressed that Jonathan Autry must agree to a broad non-disparagement clause to prevent any future criticism of Dr. Caner and that would require Jonathan Autry to take down any existing criticism on the internet.  Dr. Caner's counsel would not accept a settlement limited to simply not re-posting the alleged copyright infringing videos."  Joshua Autry Decl., Dkt. #67-2, ¶ 10 (filed May 28, 2014), *Autry*, attached as Ex. E.

12

Caner seeks to avoid this conclusion by stating rather oddly, "Mr. Smathers makes the claim time and time again that the videos were removed because of reputational implications, but if that were the primary case, then Dr. Caner would have gone on a crusade to remove all videos of himself from the Internet." (Pl.'s Resp. at 10.) This statement is odd for two reasons. First, if Caner's primary motivation was protecting his reputation, he would not "have gone on a crusade to remove all videos of himself from the Internet"; he would have gone on a crusade to remove all evidence of his *misrepresentations* from the Internet. Second, that is exactly what he did.

Caner filed takedown notices against thirty-four videos posted by Autry. (Jonathan Autry Decl. ¶ 27.) One of these videos, which was Count 2 of this case before it was severed, only included fifty-three seconds of audio or video of Caner. (*See id.* ¶ 14.) Caner "asked friendly organizations to remove damning clips from their websites." Tom Breen, *Christian leader faces questions about Muslim past*, USA Today, May 21, 2010, *available at*

http://usatoday30.usatoday.com/news/religion/2010-05-21-christian-muslim-preacher_n.htm (last accessed June 7, 2014). Mr. Breen documents more of Caner's "crusade" in a later article:

> An April radio broadcast by Focus on the Family called "From Jihad to Jesus" featured a 2001 sermon in which Caner talked about having been raised in Turkey and trained to participate in a jihad against the West.
>
> It has since been removed from the Focus site at Caner's request, a publicist there said.
>
> Several videos of Caner posted to YouTube by a London-based Muslim student named Mohammad Khan, one of the earliest bloggers to zero in on Caner's biography, have been removed over copyright complaints by Liberty University's seminary and by John Ankerberg.

Tom Breen, *Muslim-turned-preacher faces university inquiry*, Huffington Post, June 6, 2010, *at*

http://www.huffingtonpost.com/huff-wires/20100606/us-rel-preacher-s-past/ (last accessed June 7,

2014). *See also* Focus on the Family, Twitter post of 1/26/14, *at*

13

https://twitter.com/FocusFamily/status/422796796654395392 (last accessed June 7, 2014) ("Just to

let you know, Dr. Caner's staff asked us to discontinue offering this broadcast.").  It is quite telling

that at the same time Caner was asking "friendly organizations" to remove evidence of his

misrepresentations and his staff at Liberty University were filing copyright complaints against

Khan, he secured the services of Udentiti Online Profile Reputation Management, "one of the most

respected Online Reputation Management and Reputation Repair companies in the industry today."

*See* "Rolling out the Public Relations Machine" (July 31, 2010), *at*

http://majestatic.blogspot.com/2010/07/rolling-out-public-relations-machine.html (last accessed

June 7, 2014) (quoting Udentiti website).[11]  In fact, the term "Canerize" has been coined by his

critics to describe just this sort of activity:

> Since being exposed in 2010, Caner has tried (unsuccessfully, but aggressively) to
> systematically erase video and audio evidence of his lies from the Internet.  Sadly,
> churches and other organizations for whom he spoke and had posted video or audio
> of his presentations, were asked to remove his presentations from their websites and
> silently, many have honored his request in silence.  Not everyone, however, would
> honor his request to "Canerize" the evidence.

http://www.thecanerproject.com/ (last accessed June 7, 2014).

For the foregoing reasons, the Court should find that this case was improperly motivated and

award attorneys' fees accordingly.

**D.     Attorneys' Fees Are Needed to Deter Future Litigation.**

Caner argues, "[W]hen a plaintiff brings an objectively reasonable claim—to protect their

perceived 'exclusive right' for a limited time, '[t]hese Plaintiffs should not be deterred from

bringing future suits to protect copyrights.'"  (Pl.'s Resp. at 10-11 (quoting *Virgin Records*, 512

---

[11] It is important to note that Udentiti does not allow a person to hire it to repair a third party's
reputation without the third party's consent.  *See* Daniel Spratlin, "Detached from reality:
Reputation repair for hire" (Aug. 3, 2010), *at* http://danielspratlin.com/2010/08/03/detached-from-
reality-reputation-repair-for-hire/ (last accessed June 7, 2014).  This means that Caner cannot

14

F.3d at 727).)  With one minor exception, namely, that even objectively reasonable claims should be

deterred when there is an "obvious" fair use defense and no available damages or fees, *see Stern*,

2011 U.S. Dist. LEXIS at *40-49 & n.13, this is the only thing that Caner has argued in this entire

litigation with which Smathers agrees.  Unfortunately for Caner, his claim was not "objectively

reasonable," as demonstrated above, and "[w]hen a fee award encourages a defendant to litigate a

meritorious fair use claim against an unreasonable claim of infringement, the policies of the

Copyright Act are served."  *SOFA Entm't*, 709 F.3d at 1280.

It therefore comes as no surprise that Judge Moon recently ordered Caner to pay *all* of

Autry's legal expenses.  *See Caner v. Autry*, No. 14-4, 2014 U.S. Dist. LEXIS 90179, *passim* (W.D.

Va. July 1, 2014) [hereinafter *Autry II*].  The Court need only consider a representative sample of

Judge Moon's opinion to decide if it should follow his lead:

- "Plaintiff's conduct in this Court leads me to conclude that he acted with improper

  motive in bringing this suit, that he took multiple, objectively unreasonable legal and

  factual positions, and that a fee award is needed to encourage defendants like Autry

  to protect their rights against those who, like Caner, seek to suppress criticism.

  Equally, those like Caner should be deterred from exploiting the court system for

  their own purposes."  *Id.* at *12.

- "[T]his case contains too many instances of Plaintiff's dilatory conduct and

  objectively unreasonable positions to credit his recent assertions of good faith."  *Id.*

  at *16.

- "This pattern of delay, dispute, and then neglect of crucial issues is woven

  throughout this case."  *Id.* at *19.

---

argue that this service was hired without his knowledge or participation.

- "Plaintiff's sparse trickle of written argument gave way at the hearing to an overflow of objectively unreasonable claims.  For legal claims, Plaintiff carelessly made sweeping, often erroneous assertions without citing authority or briefing his arguments.  On factual issues, Plaintiff either cast unsupported aspersions or asserted boldfaced contradictions, adopting whatever narrative best served him at the time." *Id.* at *21.

- "In this case, Plaintiff filed a copyright infringement suit to stifle criticism, not to protect any legitimate interest in his work.  He and his counsel prolonged this litigation, costing Defendant and his attorney valuable time and money."  *Id.* at *29.

For the foregoing reasons, the Court should find that this case was frivolous, objectively unreasonable, and improperly motivated, and that the policies of the Copyright Act are served by a fee award which deters Caner and other potential litigants from wasting this or another Court's time in the future.

## II.   THE FEE REQUEST IS REASONABLE

Caner briefly argues that Smathers has requested an unreasonable amount of attorneys' fees, but provides no evidence or legal support for this position.  Smathers explained in detail how the requested fees were incurred and how the work performed related to this case, and Caner, in return, simply complains, "This seems like an exhorbitant amount of time for a case that was 1) worked on with a co-counsel (counsel for Mr. Autry), 2) required no hearings or travel because it was all carried out via motion practice, and 3) was resolved on a motion to dismiss before an Answer was even filed."  (Pl.'s Resp. at 11.)  Perhaps measuring Smathers' counsel against his own counsel's standards (which resulted in a total of *seven pages* of briefs filed in opposition to three dispositive motions), Caner appears not to grasp that researching and filing three fully-developed dispositive

16

motions, accompanying papers, and numerous non-dispositive motions (with accompanying briefs) takes a significant amount of time, even when working as part of a team.  Given the amount of work that went into defending Smathers against this frivolous case, Caner should be congratulating the undersigned on his efficient work instead of casting baseless aspersions.

Caner also argues, again without any support, that the fact that the undersigned agreed to represent Smathers at a reduced rate somehow reduces his entitlement to compensation for his work.  This argument is meritless.  First, the market rate for the services performed has no relation to any particular arrangement between Smathers and his counsel.  *See United Steelworkers v. Retirement Income Plan for Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555, 564-565 (9th Cir. 2008) (reasonable hourly rate is not determined by rate actually charged to the prevailing party); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007) (determination of reasonable hourly rate is not made by reference to rates actually charged by prevailing party's counsel, but rather by reference to fees private attorneys of ability and reputation comparable to that of prevailing party's counsel charge their paying clients for legal work of similar complexity); *Carson v. Billings Police Dep't*, 470 F.3d 889, 891-892 (9th Cir. 2006) (attorney's actual billing rate is some evidence of market rate, but in awarding fees court must determine and apply prevailing market rate for attorneys of comparable experience, skill, and reputation); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1493 (10th Cir. 1994) (fact that counsel charged higher rate of this plaintiff than others did not require reduction in fee, because it was established that rate actually charged was reasonable and customary for these services in relevant market).  *See also* 10-54 Moore's Federal Practice - Civil § 54.190(2)(b)(i)(B) ("The court may also award a rate higher than counsel's customary rate if it is unrepresentative of the market value of the lawyer's services.  Many lawyers, for instance, deliberately charge particular clients less for various reasons,

17

including to foster goodwill and to promote the public interest; such rates obviously do not reflect the prevailing market rate for the lawyer's services, and a fee should not be so restricted.")  Second, the fact that the undersigned works for a non-profit law firm is apropos of nothing.  *See Blum v. Stenson,* 465 U.S. 886, 892-94 (1984) (declining to draw distinction with respect to the use of market rates between for-profit and non-profit law offices).  Judge Moon soundly rejected this argument, going so far as to add, "If Plaintiff's counsel had bothered to research this question, as this Court and opposing counsel have, he would have known as much.  His continuous frivolous arguments have unnecessarily extended the length and cost of this litigation."  *Autry II*, 2014 U.S. Dist. LEXIS at \*25.  This Court should do the same.

As a last-ditch effort to avoid being held financially accountable for bringing such a frivolous lawsuit, Caner alleges, again with a complete dearth of specifics, that he "is . . . not in a financially suitable position to handle the fees described above."  (Pl.'s Resp. at 11.)  He complains that the Court should reduce the fee award because "[h]e recently moved across the country, started a new job within this past year, and is supporting his family."  (*Id.* at 11-12.)  However, the Court should view this argument with a skeptical eye, for three reasons.  First, the assertion that a plaintiff may be allowed to harass a defendant with a frivolous copyright infringement lawsuit to silence criticism and then escape paying the cost of losing because it would hurt him financially is ludicrous on its face.  If a fee award did not cause financial harm to a frivolous plaintiff, then it would not be much of a deterrent.  Second, Caner complains of his unspecified financial hardship, yet he had enough resources to pay for "reputation repair" and to pay his counsel to prosecute not one but two cases in which he had no expectation of receiving monetary damages.  Caner may not *wish* to pay Smathers' attorneys' fees and undoubtedly prefers to spend his money elsewhere, but that has never been grounds for a fee reduction.

18

Lastly, without specific factual evidence of financial difficulties, the Court should not simply take Caner at his word.  By his own telling, he is a best-selling author and states that he travels around the country giving lectures.  He is the President of a university, and the previous occupant of that position received $145,000 of income plus $25,521 in "other compensation" in 2012.  *See* Brewton-Parker College 2012 I-990 form, *at*

https://www.guidestar.org/FinDocuments/2013/580/619/2013-580619030-0a1b5b3e-9.pdf (last accessed June 7, 2014).  He owns two houses in Texas and Virginia assessed at $399,610 and $156,800, respectively.  (*See* Property assessments, attached as Exs. F and G.)  He lives at neither location, as he resides in the "President's Home" in Gilder Hall at Brewton-Parker College.  (*See* Brewton-Parker College map, attached as Ex. H.)  In short, the Court should find that, absent specific evidence to the contrary, the amount of requested fees falls well within Caner's ability to pay and would provide a proper deterrent to future litigious behavior.

For the foregoing reasons, the Court should find that Smathers' fee request, as updated to account for this filing,[12] is reasonable, and award it accordingly.

## III.    SECTION 1927 PENALTIES ARE APPROPRIATE

Caner's sole argument against the imposition of $5,000 in penalties is that his counsel was justified in consistently stating his opposition to non-dispositive motions, forcing Smathers' counsel to write full, formal briefs defending them, and then reversing position at the last moment.  Caner complains that an award penalizing this behavior "would require the non-moving parties to decide—and commit—to what a proper response would be in the course of briefing *before* the

---

[12] Smathers seeks an additional 6.7 hours of labor at $393/hour for the work spent on this Reply. This figure is less than half of the actual time spent responding to Caner's meritless arguments and baseless assertions with properly researched arguments.

19

moving party even filed a motion and a supporting memorandum." (Pl.'s Resp. at 13.) In other words, Caner takes issue with the entire "meet and confer" requirement for non-dispositive motions.

If it is an unreasonable burden to expect a party to make a decision whether or not to oppose a motion before the formal motion *and a supporting memorandum* are filed, then there is absolutely no reason for a "meet and confer" requirement. On the contrary, the "meet and confer" requirement is designed to *reduce* the work the parties must do and *reduce* the number of formal briefs placed on the Court's docket, which is not possible when a party insists on only making its final decision once it sees a fully cited, fully argued motion and brief.

This is not to say that parties must always consent, or that there is not room for initially opposing a motion and then changing one's mind. Caner's counsel, though, *consistently* did so, and even now he *defends* that practice. At the same time, he bizarrely argues that constantly forcing Smathers' counsel to file brief after brief, only to concede them at the last minute, is somehow *not* dilatory because he consented to an extension motion. (*See* Pl.'s Resp. at 13.) This argument makes no sense.

As a final attempt to avoid penalties, Caner points out that Smathers has filed a complaint with the Texas Bar Association about Caner's counsel. (*Id.* at 14.) It is unclear why Caner believes this fact to be relevant. Caner *appears* to be arguing that because the Bar has not yet adjudicated this complaint, it is a frivolous complaint, and that because Smathers filed a frivolous Bar complaint, his request for penalties must also be frivolous. (*See id.* ("Just as this non-meritorious grievance was filed with the State Bar of Texas, this non-meritorious request for sanctions has now been put before the federal court.").) However, the simpler explanation is that Caner's counsel behaved in a manner which warranted a Bar complaint and has continued to behave in a manner which warrants § 1927 penalties. Even so, though, the matter of the Bar complaint is not for this

20

Court to decide; the only question before the Court is whether or not Caner's counsel has

unreasonably and vexatiously delayed and multiplied these proceedings, which he has.

## **CONCLUSION**

For all the above reasons, the Court should order Caner and/or his counsel to pay Smathers

a total of $29,379.80.

Date:   July 20, 2014

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
N.D. Tex. Bar #984704DC
National Security Counselors
1200 South Courthouse Road
Suite 124
Arlington, VA  22204
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Defendant*

21